IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **BEVERLY J. MARTIN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Civil No. 14-cv-1082-JPG-CJP** |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

**GILBERT, District Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Beverly J. Martin is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Supplemental Security Income Benefits (SSI) pursuant to 42 U.S.C. § 423.

### Procedural History

Plaintiff applied for benefits in February, 2012, alleging disability beginning on December 5, 2011.  (Tr. 26).  After holding an evidentiary hearing, ALJ Patricia Witkowski Supergan denied the application for benefits in a decision dated May 14, 2014.  (Tr. 26-36).  After the Appeals Council denied review, the May 14, 2014, decision became the final decision of the Commissioner subject to judicial review.  Administrative remedies have been exhausted and a timely complaint was filed in this Court.

### Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred in weighing the medical opinions of Dr. Parks, plaintiff's primary care physician.

2. The ALJ did not give an adequate rationale for her credibility analysis.

3.  The ALJ's finding that plaintiff could frequently reach, handle, finger and feel was not supported by substantial evidence.

## Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[1]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity.   The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling.   If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues.   The fourth step

---

[1]  The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 23, *et seq.*, and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.   Most citations herein are to the DIB regulations out of convenience.

assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work.   If an applicant can engage in past relevant work, he is not disabled.   The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th  Cir. 1984).   *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled….   If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Ms. Martin was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Richardson v. Perales*, 402 U.S. 389, 401 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Supergan followed the five-step framework described above.   She determined that Ms. Martin had not been engaged in substantial gainful since the date of her application.   She found that plaintiff had severe impairments of carpal tunnel syndrome, degenerative disc disease of the cervical spine, rheumatoid arthritis, obesity and anxiety.   She further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found plaintiff had the residual functional capacity to perform work at the sedentary level, limited to occasional climbing of ramps and stairs; no climbing of ladders, ropes or scaffolds; and occasional balancing, stooping, kneeling, crouching and crawling.   She was limited to frequent reaching in all directions and frequent handling, fingering and feeling with the

4

right upper extremity.[2] She was limited to occasional exposure to extreme cold and to hazards such as moving machinery and unprotected heights.   Lastly, she was limited to unskilled work that can be learned by demonstration or in 30 days or less, of a simple, routine and repetitive nature.

Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past work.   However, she was not disabled because she was able to do other work that exists in significant numbers in the regional and national economies.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

### 1.    Agency Forms

Plaintiff was born in 1965 and was 46 years old on the alleged onset date of December 5, 2011.  (Tr. 200).

In January, 2013, Ms. Martin submitted a Function Report.   She lived with her elderly mother and two daughters.   Her daughters were then 16 and 10 years old.   She said that her rheumatoid arthritis caused stiffness and pain.   She had neck pain which caused headaches.   She did simple household chores like laundry and vacuuming, but this took her all day.   Her children helped her.   She made simple meals with the help of her mother.   She had problems with sitting, walking, standing, reaching, using her hands, and concentrating.   (Tr. 241-254).

Plaintiff had been employed as a social worker and a special education supervisor.   She

---

[2]  The agency defines occasional as "occurring from very little up to one-third of the time."   Frequent is defined as "occurring from one-third to two-thirds of the time."   SSR 83-10, 1983 WL 31251, *5-6.

stopped working in April 2008 because she "was a teacher and they cut back."   (Tr. 204-205).

### 2.   Evidentiary Hearing

Ms. Martin was represented by an attorney at the hearing.   (Tr. 54).

Plaintiff testified that she stopped working because she developed coccydynia and rheumatoid arthritis.   (Tr. 56).   She was unable to say why she chose December 5, 2011, as the date of the onset of her disability.   (Tr. 57).

Ms. Martin did a little cooking.   Her older daughter, then 17 years old, did the grocery shopping.   (Tr. 59).   She did not use a computer.   (Tr. 61).   She said that she was unable to work because she "can't function."   She could not sit, stand, bend her neck, or stoop.   She had anxiety attacks and could not concentrate or focus.   She had lost about 50 pounds in the last 2 years because her medication made her nauseous.    She was incontinent and had to wear protective undergarments.   She had pain in all her joints, including her fingers.   (Tr. 64-66).   She had difficulty using her hands such that she could not open a bottle or jar.   (Tr. 69).

Dr. Ezike testified as an independent medical expert.    He did not examine plaintiff, but did review her records.   He testified that her main impairments were cervical degenerative disc disease, carpal tunnel syndrome, polyarthralgia, hypertension, rheumatoid arthritis, and alcoholic liver disease.   (Tr. 76).   He testified that, in his opinion, she had the residual functional capacity (RFC) to do light work (occasionally lifting 20 pounds and frequently lifting 10 pounds), sit for 6 hours a day, stand/walk for 4 to 6 hours a day, and should have a sit/stand option.   She was limited to occasional postural activities.   As to manipulative limitations, Dr. Ezike testified that she was limited to frequent repetitive wrist motions with the right hand such as keyboarding and typing, and she was limited to frequent reaching, handling, grasping and feeling on the right, with no limitations of the left upper extremity.   (Tr. 77-78).

6

A vocational expert (VE) also testified.   The ALJ asked him a series of hypothetical questions.   (Tr. 85-87).   One question corresponded to the ultimate RFC findings previously described.   The VE testified that this person could not do plaintiff's past work, but she could do other work which exists in significant numbers in the regional and national economies.   Examples of such jobs are information clerk, weight tester and surveillance system monitor.   (Tr. 85-88).

If plaintiff were limited to only occasional handling and fingering, the jobs that the VE identified would be eliminated.   (Tr. 89).

### 3.    Medical Treatment

On a referral from primary care physician Jeffrey Parks, M.D., plaintiff was seen by Dr. Alex Befeler at the St. Louis University Liver Center in April 2012.   Dr. Befeler wrote a letter to Dr. Parks summarizing his visit.   Dr. Befeler saw her for elevated liver chemistries.   He noted that she was hospitalized in January 2012 after a 6 month period of binge drinking.   She had been sober since then.   He also noted that she had a history of chronic coccygeal pain and she complained of diffuse joint aches.   He concluded that she had alcoholic liver disease, but he did not see any clear evidence of underlying cirrhosis or advanced liver disease.   (Tr. 383-384).

On April 20, 2012, plaintiff complained to Dr. Parks of joint pain, burning feet and bad headaches.   She said she had trouble putting on a shirt and getting out of the bathtub.   She also said she got confused more easily and had mood swings.   She was "seen w[ith] her mother who agrees w[ith] this hx [history]."   On exam, she had a full range of motion of the spine and extremities.   Dr. Parks prescribed Prednisone.   (Tr. 554-557).   In May 2012, she reported that she felt better on steroids, but her symptoms returned when she stopped taking Prednisone.   She also complained of confusion, thinning hair and splitting nails.   Dr. Parks again prescribed Prednisone and advised her to be seen by a rheumatologist as he suspected rheumatoid arthritis.

7

(Tr. 551-553).

In June 2012, Ms. Martin was seen by Dr. Humayun Beg, a rheumatologist.   Labwork showed negative ANA and rheumatoid factor, but her sed rate was significantly elevated.   She had been on Prednisone for 3 months, which gave her symptomatic relief.   On exam, she had full strength in all extremities.   She had trace synovitis in the finger joints and +1 synovitis in the wrists.[3]   There was no synovitis or tenders in the knees, ankles or toe joints.   Dr. Beg recommended additional testing and x-rays.   (Tr. 458-459).

Dr. Parks prescribed Paxil for depression in July 2012.   (Tr. 536-537).   In August, Dr. Parks noted that her weight was up to 195 pounds.   (Tr. 533).

Plaintiff returned to Dr. Beg in August 2012.   He diagnosed her with rheumatoid arthritis. She had bilateral symmetrical joint swelling in the wrists and metacarpophalangeal joints in the fingers.   Labwork showed elevated inflammatory markers.   Dr. Beg prescribed Methotrexate and advised her to taper down her dosage of Prednisone.   (Tr. 454-455).   X-rays of the lumbar spine showed mild degenerative disc disease at L5-S1.   (Tr. 501).   Cervical spine x-rays showed severe degenerative disc disease at C5-6 and C6-7.   (Tr. 490).   Copies of those x-ray reports were sent to Dr. Parks.   (Tr. 624-631).

In October 2012, Dr. Beg found no synovitis in the hands, wrists, ankles or toe joints. Plaintiff complained of mild hand arthralgias.   Dr. Beg increased the dosage of Methotrexate. (Tr. 451).

Plaintiff saw Dr. Parks in January 2013 for neck pain which radiated down her left arm. She had a full range of motion of the spine and a negative Spurling's Test.   Strength was full throughout.   Dr. Parks prescribed Medrol and an MRI of the cervical spine.   (Tr. 511-513).   On

---

[3] "Synovitis is an inflammation of the joint lining, called synovium."   http://www.hss.edu/ condition-list _synovitis.asp, visited on August 21, 2015.

January 28, 2013, Dr. Parks noted that the MRI showed bulging discs at C5-6 and C6-7 with neural foraminal narrowing.   He referred her to Dr. Sonjay Fonn for her neck.   He also noted that plaintiff's plantar fasciitis persisted with no changes.   He suggested a podiatry consult, but she was unable to afford it.   Dr. Parks gave her an injection in her foot and prescribed orthotics and Neurontin.   (Tr. 693-695).

Dr. Fonn, a neurosurgeon, saw plaintiff on March 14, 2013.   He concluded that she had cervical spondylosis.   He recommended that she undergo a series of 3 epidural steroid injections at C5-6 and C6-7.   He stated that, if she were not any better after that, "she may be a candidate for surgical intervention which will probably be a fusion" at C5-6 and C6-7.   Dr. Fonn sent a copy of his office note to Dr. Parks.   (Tr. 911-913).

Later in March 2013, plaintiff told Dr. Parks that she did not like Dr. Fonn and would not return to him.   (Tr. 688).

On March 20, 2013, an EMG ordered by Dr. Parks showed moderate right median neuropathy at the wrist (carpal tunnel syndrome).   (Tr. 871-874).

Plaintiff was scheduled to have carpal tunnel surgery in June 2013.   However, she had been having heart palpitations and Dr. Parks ordered Holter monitoring.   On June 3, 2013, he diagnosed atrial fibrillation.   He advised her to cancel her surgery and to see a cardiologist.   (Tr. 674-676).

In November 2013, plaintiff saw Dr. Parks for a cat bite and increase of her joint pain in the cold weather.   She said that her rheumatologist no longer accepted her insurance (Medicaid). She was taking Methotrexate and Prednisone, but her pain was not controlled.   Her weight was down to 174 pounds.   Dr. Parks increased the dosage of Methotrexate and prescribed Celebrex. He told her to return in one week for a plantar fasciitis injection.   (Tr. 659-662).   Both heels were

9

injected with Kenalog on November 15, 2013.   (Tr. 656-658).

In December 2013, Dr. Parks saw her for management of her rheumatoid arthritis.   He had previously referred her to an internal medicine specialist for this, but she had not been able to see him.   She had also not seen a specialist for her neck pain.   She complained of neck pain and more frequent migraines associated with nausea and photophobia.   She also complained of increased anxiety.   Dr. Parks increased the dosage of Neurontin of her antidepressant medication.   He again noted that she needed to be seen by a specialist for her neck and for her rheumatoid arthritis. (Tr. 652-654).

Dr. Amjad Roumany, a rheumatologist, saw Ms. Martin for her rheumatoid arthritis in January 2014.   She complained of increasing discomfort and pain, mainly in her hands, knees and ankles.   She said she had swelling at times in her hand and knees.   She weighed 165 pounds.   On exam, she had no evidence of synovitis in the joints of the upper or lower extremities.   She did have diffuse myofascial tender points in her elbows, knees, second rib area, trapezius muscle area and lumbar spine area.   Dr. Roumany asked her to decrease the dosage of Prednisone for two weeks and then to discontinue it.   She was to continue to take Methotrexate.   He wanted to evaluate her further "to see if she has underlying chronic arthritis."   (Tr. 884-885).

Ms. Martin returned to Dr. Roumany on February 26, 2014.   She told the doctor that she felt worse after stopping Prednisone.   She had difficulty ambulating, especially in the morning, and stiffness and some swelling in her hands as well as increased pain in her hands, knees and shoulders.   On exam, she had no synovitis in the joints of the extremities.   Her gait was normal and she had a full range of motion.   She had "squeeze tenderness" of the joints in her fingers and "noticeable decrease in fist formation bilaterally."   She also had significant discomfort with range of motion of both shoulders.   Dr. Roumany copied Dr. Parks on his office notes.   (Tr. 882-883).

10

Plaintiff was seen by Dr. Gerson Criste in March 2014.   He noted that she had chronic neck pain with radiation to the scalp and bilateral shoulders.   She was neurologically intact on exam, but had "significant degenerative changes" and significant reversal of cervical lordosis.   He recommended facet joint steroid injection.   He said he would consider a series of cervical epidural steroid injections, and, if conservative treatment failed, he would refer her to neurosurgery.   (Tr. 920).

In April 2014, Dr. Criste administered bilateral C4-5 and C5-6 facet joint injections under fluoroscopy.   Ms. Martin indicated that she was "concerned" about the physical therapy that he prescribed because she did not have the resources to drive to therapy and pay the co-pay.   He encouraged her to attend at least a few sessions so that she could learn how to do the exercises. He also increased her Tramadol dosage at her request.   (Tr. 922-923).

4.    **Consultative Medical Examination**

Dr. Adrian Feinerman, a specialist in internal medicine, examined plaintiff at the request of the agency on June 18, 2012.   He reviewed medical records consisting of a history and physical note and a hospital discharge note regarding treatment for hypothyroidism, alcohol abuse and GI bleeding, and a CT and x-ray of the abdomen.    Ms. Martin told Dr. Feinerman that she had joint pain for about a year, primarily in her hands, knees, hips, shoulders, ankles, wrists, neck and lower back.   Physical examination was normal.   She had a full range of motion of the spine and all joints.   There was no redness, warmth, thickening or effusion of any joint.   Grip strength was full and equal.   Sensory examination was normal.   Fine and gross manipulation were normal.   She was able to "lift, carry, and handle objects without difficulty."   The exam lasted 23 minutes.   Dr. Feinerman did not offer an opinion as to plaintiff's RFC.   (Tr. 397-408).

### 5.     Medical Opinions

Based on a review of the medical records, state agency consultant G.A. Gotway, M.D., opined that plaintiff could do a full range of work at the light exertional level, with no manipulative limitations.   His report was dated June 28, 2012.   (Tr. 423-430).   In January 2013, a second state agency consultant reviewed new medical records, including the records relating to rheumatoid arthritis and the cervical MRI showing "severe DDD," but reaffirmed the opinion that she could do a full range of light work.   (Tr. 642-644).

Dr. Parks completed a form entitled "Liver Report" that was submitted to him by the agency in July 2012.   The form asked questions about liver functioning, and Dr. Parks' answers were mostly in the negative.   He indicated that his diagnosis was "polyarthralgias," suggesting that the Liver Report form was not particularly relevant to his treatment.   He indicated that Ms. Martin had "severe limitations on standing, sitting, walking, lifting, carrying, handling & travelling."   (Tr. 436-439).

In February 2014, Dr. Parks signed a form entitled "Medical statement regarding illnesses, physical abilities and limitations for Social Security disability claim."   This form was also signed by Micah Oakley, a physician's assistant who worked with Dr. Parks.   This form indicated diagnoses of rheumatoid arthritis, arthralgias, migraine headache, plantar fasciitis, cervical disc herniation and cervical spine stenosis, lumbar disc herniation and annular tear.   Under treatment, Dr. Parks indicated that she was seeing a neurosurgeon and physiatrist and a rheumatologist.   He indicated that she could sit and stand for only 15 minutes at a time, could never raise either arm over her shoulder, and could only occasionally perform manipulations with either hand.   (Tr. 880-881).

12

6.      **Records not before the ALJ**

The transcript contains medical records that were not before the ALJ.   As of the time the ALJ issued her decision, the medical records consisted of Exhibits 1F through 25F, *i.e.*, Tr. 272 through 923.   *See* List of Exhibits attached to ALJ's decision, Tr. 39-41.   Plaintiff submitted the additional records to the Appeals Council, which considered them in connection with her request for review.   *See* AC Exhibits List, Tr. 4.   Thus, the medical records at Tr. 924-928, designated by the Appeals Council as Exhibit 26F, were not before the ALJ.

The medical records at Tr. 924-928 cannot be considered by this Court in determining whether the ALJ's decision was supported by substantial evidence.   Records "submitted for the first time to the Appeals Council, though technically a part of the administrative record, cannot be used as a basis for a finding of reversible error."   *Luna v. Shalala*, 22 F3d 687, 689 (7th Cir. 1994).

<u>**Analysis**</u>

Plaintiff first argues that the ALJ erred in weighing the opinions of Dr. Parks.[4]

The opinions of treating doctors are not necessarily entitled to controlling weight.   Rather, a treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record.   *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).

20 C.F.R. § 404.1527(c)(2) states, in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective

---

[4] Dr. Parks also rendered an opinion as to plaintiff's mental limitations.   (Tr. 440-443).   As plaintiff's argument focuses on the opinions regarding her physical condition, the Court will not discuss the psychiatric report in any detail.

medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

Obviously, the ALJ is not required to accept a treating doctor's opinion; "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted).   It is the function of the ALJ to weigh the medical evidence, applying the factors set forth in § 404.1527.   Supportability and consistency are two important factors to be considered in weighing medical opinions.   *See* 20 C.F.R. § 404.1527(c).   In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) (citing § 404.1527(d)).

In weighing the medical opinions, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with her conclusion.   *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).   While she is not required to mention every piece of evidence, the ALJ "must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).

The ALJ gave "minimal weight" to the opinions rendered by Dr. Parks in July 2012. These opinions consist of the "Liver Report" and a psychiatric report.   The ALJ's discussion mostly concerned the psychiatric report.   The only observation relevant to the Liver Report is, "His treatment notes fail to document such severe limitations and it appears that his opinions are

sympathetic and based on the claimant's subjective complaints."    (Tr. 34).

The ALJ gave "little or no weight" to the February 2014, opinion.   While acknowledging that the report had been signed by Dr. Parks as well as by PA Oakley, she said that she gave the opinion "no weight as he [the physician's assistant] is not an acceptable medical source and the issue of disability is an opinion reserved for the Commissioner.   Given the lack of overall support in the record, this too would appear to be a sympathetic opinion and thus entitled to little or no weight."   (Tr. 34).

There are several problems with the ALJ's consideration of Dr. Parks' opinions.   First, she dismissed the 2014 opinion because she considered it to be the opinion of a physician's assistant, who is not an "acceptable medical source."   *See* 20 C.F.R. § 404.1513(a).   However, Dr. Parks signed the report as well as Mr. Oakley, and the ALJ gave no reason for not considering the report as expressing the opinion of Dr. Parks.

Even if the 2014 report represented only the opinion of the physician's assistant, the ALJ would have been wrong to simply dismiss it for that reason, as she did.   The opinions of providers who are not acceptable medical sources are not "medical opinions" and are not entitled to any special weight under § 404.1527(c).   SSR 06-03p, 2006 WL 2329939, at *2.   *See* 20 C.F.R. § 404.1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources. . . .)"   This does not mean, however, that the ALJ may simply ignore such opinions.   The ALJ is required to consider "all relevant evidence" and may, as appropriate, consider the factors set forth in § 404.1527(c) in the process of weighing the opinions of nonacceptable medical sources.   SSR 06-3p, at * 4-5.

The second reason given for dismissing the February 2014 opinion was that the issue of disability is reserved for the Commissioner.   However, while the legal conclusion of whether a

15

claimant is entitled to benefits is a question for the Commissioner, the "answer to the question depends on the applicant's physical and mental ability to work full time, and that is something to which medical testimony is relevant and if presented can't be ignored." *Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013). And, the ALJ did not consistently apply this rationale to her weighing of the medical opinions. She gave Dr. Ezike's opinion "great weight" despite her view that the issue of disability is reserved to the Commissioner. *See Bjornson v. Astrue*, 671 F.3d 640, 648 (7th Cir. 2012) (criticizing an ALJ for applying the "issue reserved to the Commissioner" rationale to the opinion of a treating doctor but not to a state agency consultant).

The overarching problem with the ALJ's weighing of Dr. Parks' opinions, along with the other medical opinions, is that she failed to analyze them in any meaningful way. She dismissed Dr. Parks' opinions with the blanket statement that his notes did not document such severe limitations and his opinions are "sympathetic" and based on plaintiff's subjective complaints. She did not explain why she viewed his opinion as sympathetic, other than the obvious fact that his opinions supported Ms. Martin's claim. It is true that treating doctors sometimes "bend over backwards" to help a patient get benefits. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). However, that assumption cannot be made of every treating doctor, and the ALJ did not point to anything in this record indicating that Dr. Parks was doing so.

The ALJ's blanket statement that Dr. Parks' treatment notes do not document severe limitations is likewise unexplained. The Commissioner points out that the ALJ stated that Dr. Parks' records "consistently documented full strength and motor functions." Doc. 19, p. 5. That is accurate. However, Dr. Parks was also aware of the results of the x-rays, cervical MRI and nerve conduction study, along with the observations and conclusions of the specialists to whom he referred Ms. Martin in his role as her primary care physician. His report referred to the fact that

16

she was seeing a neurosurgeon and a rheumatologist.   (Tr. 880).   The ALJ never explained the basis for her conclusion that Dr. Parks' "treatment notes," which included the test results and reports from specialists, failed to support his opinions.

Plaintiff's third point, which is related to her first point, challenges the ALJ's RFC finding with regard to plaintiff's ability to use her arms and hands.   Dr. Parks' records reflect that Ms. Martin suffered from carpal tunnel syndrome, degenerative disc disease in the cervical spine, and rheumatoid arthritis.   The ALJ found that she did, indeed, suffer from those conditions, but concluded that she was able to do sedentary work, limited (as relevant here) to frequent use of her right upper extremity.   Dr. Parks, however, thought that she was limited to occasional manipulations with both hands and could never reach overhead with either arm.

The agency defines occasional as "occurring from very little up to one-third of the time." Frequent is defined as "occurring from one-third to two-thirds of the time."   SSR 83-10, 1983 WL 31251, *5-6.   According to the VE's testimony, if plaintiff were limited to only occasional fingering and handling, she would not be able to do the sedentary jobs which he identified.   (Tr. 89).   This is consistent with guidance from the agency:   "Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.   Any significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base."   SSR 96-9P, 1996 WL 374185, p. 8.

The ALJ did not explain the basis for her conclusion that Ms. Martin was capable of frequent fingering and handling.   The Commissioner's argument points to Dr. Feinerman's exam, which showed full strength and that plaintiff was able to perform gross and fine manipulations. However, according to Dr. Ezike's testimony, a person with normal strength may still have

17

"difficulties with fingering and feeling."   (Tr. 81).   Further, that exam occurred in June 2012, and lasted a total of only 23 minutes.   Dr. Feinerman's exam provides only scant support for the conclusion that Ms. Martin is capable of handling, fingering and feeling for up to two-thirds of the workday.

The ALJ also relied on Dr. Ezike's opinion.   She said that she gave his opinion "great weight."   Dr. Ezike testified that plaintiff was capable of frequent handling, grasping and feeling, as well as frequent wrist motions such as keyboarding.   (Tr. 78).   He also testified that Ms. Martin was able to lift 20 pounds occasionally and 10 pounds frequently.   (Tr. 77).   This corresponds to work at the light exertional level, not the sedentary level.   20 C.F.R. § 404.1567(b).   The ALJ erroneously stated that Dr. Ezike testified that plaintiff was limited to sedentary work.   (Tr. 34).   She mischaracterized his opinion, and her statement that she gave great weight to his opinion is incorrect.   In fact, she rejected his opinion because she concluded that plaintiff was limited to only sedentary work.   She gave no reason for rejecting his opinion as to plaintiff's exertional limitations but accepting it as to her manipulative limitations.   Therefore, her conclusion that plaintiff could frequently use her hands is not supported by substantial evidence.   *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (ALJ failed to build a logical bridge from the evidence to her conclusion where "the primary piece of evidence that she relied on does not support the propositions for which it is cited").

The Court also concludes that the credibility analysis was erroneous.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness.   *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief

18

of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.

"[D]iscrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). At the same time, however, social security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

Here, it appears that the ALJ found that plaintiff was not credible because she perceived that plaintiff's complaints were not supported by objective evidence (Tr. 31) and her testimony that she relied heavily on her daughter's assistance was not supported by the record (Tr. 33).

Plaintiff correctly argues that there was objective evidence in the record in the form of x-rays, cervical MRI and nerve conduction studies that supported plaintiff's complaints. The ALJ never explained why, in the face of that evidence, she concluded that plaintiff's complaints were not supported by objective evidence. The ALJ is required to give "specific reasons" for her credibility findings. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Ibid. See also Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir., 2009) (The ALJ "must justify the credibility finding with specific reasons supported by the record."). Because ALJ Supergan failed to do so here, the credibility analysis cannot stand.

Because of the above errors, this case must be remanded. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."

19

*Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).   *See also Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) ("[A] denial of benefits cannot be sustained where an ALJ failed to articulate the bases of his assessment of a claimant's impairment.").

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Martin was disabled or that she should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Beverly J. Martin's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATE:   August 27, 2015**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**